BOUTALL, Judge.
This appeal involves the competition for priority between a mortgagee and laborers and materialmen. ■
On June 28, 1972, Tri-South Mortgage Investors, hereinafter referred to as TriSouth, foreclosed upon a mortgage granted it by the Forest and Waterway Corporation on a development project known as the Forest Isles Apartment Complex, Tall Timbers Subdivision. A Sheriff’s sale was scheduled for August 17, 1972 by the Civil Sheriff for the Parish of Orleans. However, numerous contractors and material-men filed petitions of intervention prior to the Sheriff’s sale as well as subsequent to the Sheriff’s sale, seeking to determine the ranking of privileges on the proceeds. The trial court ordered the Sheriff to hold all the proceeds of the sale pending disposition of the issue of the validity and priority of the asserted liens. The purchaser at the sale was the mortgagee, Tri-South.
The lower court referred the trial of the ranking and validity of the liens to a Commissioner who tried the claims. The Commissioner submitted a report and the trial court then adopted the report of the Commissioner and rendered various judgments. Some judgments ranked the priority of the asserted liens and privileges above that of the mortgage granted in favor of Tri-South and granted a personal judgment against Tri-South for the amounts found due by the Commissioner. Additionally, some liens and claims filed were either dismissed or settled. Tri-South now appeals those judgments which acknowledge the priority of liens and claims of 13 claimants who claim under authority of LSA-R.S. 9:4801 et seq. Two claimants, Wallace C. Drennan, Inc. and Summit Building, Inc. have answered the appeal and seek an increase in the quantum of their claims recognized in the lower court.
There are numerous principal issues for us to consider in this appeal. How *591 ever, the issue which we must consider first is the question of when did the work begin on the Forest Isles Apartment Complex? The answer to that question is basically determinative of the rights of the mortgagee, Tri-South and the various claimants. LSA-R.S. 9:4812 says that the laborers and materialmen’s privilege shall be superior to all the claims against the land except for a bona fide mortgage, if the “mortgage exists and has been duly recorded before the work or labor is begun or any material is furnished.” LSA-R.S. 9 ¡4819(A)(1) defines the term “before the work or labor is begun or any material is furnished” as:
“(1) In the event that the work or construction is new, then ‘work or labor is begun or material is furnished’ is defined as having begun when either excavation has been started so that it can be observed on inspection, or material has been furnished and delivered to the job site which is visible upon inspection and which material when delivered had a value in excess of one hundred dollars provided, however, that test piling shall be excluded from this definition.”
The mortgage granted in favor of TriSouth in the amount of $7,500,000 against the subject property was executed and recorded on April 8, 1971, but there is a serious question as to when the work was begun. The testimony of numerous contractors, especially employees of Rouse’s Dozer Service, was that a large and ambitious project had already been under way to clear the land and begin the construction prior to April 8, 1971. Counsel for appellant Tri-South attempts to characterize the work during prior to April 8 as merely clearing of the land and not excavation, and to support this contention appellant cites several cases distinguishing clearing work from excavation work as intended by the Statute.
In the case before us we cannot reach any other conclusion but that the work done prior to April 8 was that type of work intended to be covered by the private works statute. The testimony of various contractors and workers was that, of the 26 acre site that the apartment complex was to cover, approximately 90% of that area had been cleared in preparation for the stages of construction for the individual housing units that were to immediately follow the clearing. This clearing project, which included the cutting of swale ditches for drainage, building temporary and basic roads, moving earth to building sites, and various other projects in an amount of approximately $19,000 was the first step in the overall construction process. As such it is impossible to distinguish this project from the rest of the construction project. As the Commissioner found in his report:
“The intent of the developer to continue the work from the inception of land clearing to the completion of the apartment complex is manifest. There was no interlude between the land clearing and the construction of buildings. There was no sale of any part of the cleared ground to other parties.
“R.S. 9:4819 defines the beginning of work as ‘when excavation has been started so that it can be observed on inspection.’ There is no question but that on April 8, 1972, (sic) the prudent mortgage investor would have observed, and thereby been enlightened, in regard to the extensive land clearing and excavations taking place in coordination with the intended development of the site as a large apartment complex.”
If a mortgagee fails to protect his interest by inspection of the property to determine whether work has commenced or materials have been supplied, he proceeds at his own peril with respect to the priority of liens of materialmen or laborers. Capitol Bank & Trust Company v. Broussard Paint & Wallpaper Company, La.App. 1st Cir., 198 So.2d 204 (1967). The test is not whether such an inspection is actually made, but rather would such an inspection, if made, reveal that the work had already begun. Pringle-Associated Mortgage Corporation v. Evans-Benck Construction Company, La. App. 1st Cir., 209 So.2d 606 (1967). We hold that had the mortgagee in this case, TriSouth, taken the simple precaution of in *592 specting the subdivision to determine if work had already begun, it could have protected its interest prior to entering into the mortgage. With a vast area having already been cleared by April 8,[1] and numerous pieces of construction equipment working on the construction site at the time, a simple inspection by the mortgagee would unquestionably have revealed the fact that work had begun. Therefore the liens of laborers and materialmen prime the mortgage.
Having decided that the labor and materialmen’s liens outrank the mortgage held by Tri-South, we now pass to a consideration of the effect of the filing of lien release bonds by Tri-South upon those liens.
To place this issue in proper perspective, we must recount the procedural situation at that time. The basic suit herein is a mortgage foreclosure via executiva by Tri-South Mortgage Investors, holders of the mortgage, against Forest & Waterway Corporation, owners of the property upon which the mortgage was given and the development project took place, giving rise to the liens herein involved. In this proceeding numerous subcontractors and materialmen filed petitions of intervention. Those interventions were referred to the Commissioner of the Civil District Court for trial, and some 5 days of trial followed over a lengthy period. The proceeding was a summary proceeding in which the lien holders asserted their claim to preference in the distribution of the proceeds of the sale of the property, C.C.P. Articles 2643 and 1092, and C.C.P. Article 2592. At this point in the trial Tri-South filed a motion asking for a continuance of the trial to rank privileges until after the judicial sale of the property, and the trial court signed an order continuing the trial and ordering the sheriff to hold the proceeds of the sale in an amount sufficient to satisfy all lien claims. The judicial sale of the property was advertised for August 17, 1972, and on the day before the sale, Tri-South filed with the Recorder of Mortgages corporate surety bonds in amounts equal to 1Í4 times the amount of each lien claimed, and caused the Recorder of Mortgages to cancel the inscriptions of the liens. In each instance the lien-release bond was executed by Tri-South Mortgage Investors as principal and Highlands Insurance Company as surety conditioned as follows:
“Now the condition of the above obligation is such that in the event the priority and validity of the aforesaid claim of lien is established by suit or otherwise, this bond shall remain in full force and effect to protect the interest of the claimant in the premises and to secure payment of said claimant by Tri-South Mortgage Investors.”
******
“This bond is intended to satisfy all requirements of Revised Statute 9:4841 et seq., which requirements are hereby incorporated.”
From the filing of these bonds, a number of questions arise. The first is the effect on the liens. Tri-South argues that these bonds have the effect of cancelling the liens and that the lienholder’s rights are relegated simply to the bonds. We cannot agree. Rights arising under the lien statutes are stricti juris. R.S. 9:4841 grants to contractors the right to bond claims, and Section 4842 grants to property owners the right to bond claims. Prior to the judicial sale, TriSouth was neither the contractor nor the property owner, but was only a mortgage holder. Tri-South has referred us to no other authority than these statutes, and indeed we are unaware of any provision of the private works act which would permit such a cancellation of liens by a mortgage holder. Thus, at the time of the judicial sale, the liens had been improperly can-celled by the mortgage holder, and the proceeds of the sale were to be held subject to the order of the court and subject to the ranking of the privileges.
*593 At the judicial sale, the mortgage holder was the purchaser, and it has held the proceeds in its possession because the proceeds were not large enough to satisfy its own mortgage claim, and because the liens had been cancelled. Under these circumstances it would appear to us that the effect of the bonds furnished, conditioned as they are, is to stand as additional security to the lien claimants for payment of their ranking liens, along with the proceeds of the sale. We rule that the filing of a lien-release bond by the mortgage holder does not have the effect of depriving claimants of their right to proceed by summary process intervention for a determination of the validity and ranking of their claims against the proceeds of the property.
Next, appellant argues that the intervenors who filed after the execution and recordation of the Sheriff’s Proces verbal of the judicial sale, August 22,1972, are in a different position than those who filed before. (See appellant Brief page 25 for listing of 7) The contention is that the adjudicatee being the mortgage holder, it has retained in its hands the full amount of the purchase price and this amounts to a distribution of the proceeds, after which a third party claiming a mortgage or privilege cannot intervene. We are referred to C.C.P. Article 1092 which provides that intervention may be filed at any time prior to the distribution of the proceeds of the sale and C.C.P. Article 2378 which provides that when the purchaser fails to pay a lien superior to the mortgage of the seizing creditor, the superior lien or privilege may be enforced in an ordinary proceeding against the purchaser. Thus appellant contends that neither intervention nor summary process is permitted for those filing after the judicial sale has been executed.
To this contention we reply that C.C.P. Article 2724 makes applicable certain rules respecting sale under writ of fieri facias to executory writs of seizure and sale. C.C.P. Article 2372 provides that the property is sold subject to any real charge with which it is burdened superior to the mortgage of the seizing creditor. Articles 2373 and 2374, together with those following generally govern the distribution of proceeds of the sale. The purchaser here, claiming to be the superior and seizing creditor has never paid anything to the Sheriff for distribution. This despite the fact that the proceedings for ranking of the creditors was still in process, and the fact that the creditor had improperly obtained cancellation of the superior liens. While C.C.P. Article 2378 provides that a superior lien may be enforced in an ordinary proceeding, it is not exclusive. Under the circumstances outlined above, we see no reason to reject the interventions filed after the judicial sale at a time when the ranking proceedings were still pending and the price had not been given the Sheriff for distribution. Surely a mortgage holder cannot improperly cancel all of the liens ranking ahead of him, and by this device withhold from the sheriff the proceeds of the sale and then validly contend that the ranking privileges have no standing because the proceeds have been distributed by himself to himself. We agree with the ruling of the trial court dismissing plaintiff’s exceptions based on this premise.
Until a judicial determination of ranking of privileges, Tri-South had no right to retain the cash purchase price and thus in effect was the recipient of a thing not due under Civil Code Article 2301. TriSouth thus became the trustee of the funds with a distinct codal obligation to restore those funds — in this case, under the condition that a judicial determination occurs, ranking the lien claims as superior to TriSouth’s mortgage.
The next issue is appellant’s contention that the privileges asserted by the intervenors have perempted or prescribed because some ten of them have failed to record in the mortgage records any notice of filing of a suit in accordance with the provisions of R.S. 9:4812. Appellant contends that failure to file the required notice is fatal to the privilege perfected by the filing of the lien and affidavit, citing as authority Robins v. Pavone, 224 So.2d 541 (La.App. 4th Cir. 1969) and Lafayette *594 Woodworks v. Boudreaux, 255 So.2d 176 (La.App. 1st Cir. 1971). It further urges that even where a lien release bond has been filed and the lien affidavit cancelled, strict compliance with the provisions of R.S. 9:4812 must be made in order to avoid per-emption of the privilege. Brunet v. Justice, 264 So.2d 743 (4th Cir. 1972).
While we agree with the principles of those cases, we do not consider them controlling of the issue here. We point out that a judicial sale has taken place and the effect of that sale is to cancel the lien on the record as to the property itself and the lien is referred to the proceeds of the sale. City National Bank of Baton Rouge v. Sunshine Processing Co., 209 So.2d 161 (La.App. 4th Cir. 1968). In that case it was held that it was unnecessary for an intervenor to reinscribe its lien after the sale of the property by the Sheriff, since the claim followed the funds into the hands of the Sheriff. We further refer to our decision in the case of Federal National Bank & Trust Company v. Calsim Company, Inc., 340 So.2d 611 (4th Cir. 1976) wherein we held that an answer filed in a concursus proceeding was the equivalent of the suit required under the terms of Section 4812. In that case, this court relied on the case of Hunt v. LaChere Maison, Inc., 316 So.2d 850 (La.App. 1st Cir. 1975) which stated as follows:
“The present requirement of a notice of lis pendens serves the identical purpose of lien reinscription required by Section 4812, above, prior to its amendment in 1966. In this instance, the Sheriff’s sale occurred within a year of recordation of Carson’s lien. Carson asserted his lien in Appellant’s concursus proceeding within a year of the date the lien was filed. This suffices to preserve the rank of his claim, and render it immune to a plea of prescription predicated upon failure to file a notice of lis pendens.”
In the case before us all of the lien claims have been exerted by way of petitions of intervention prior to the 1 year prescriptive date. Several of these intervenors had also filed separate suits together with notice of suit as statutorily required. We can perceive no difference between a petition of intervention in executory process for writ of seizure and sale and an answer in a concursus proceeding insofar as filing of suit under Section 4812 is concerned. Under the theory of Hunt, notice is no longer necessary after sheriff’s sale of the property. Accordingly, the lien claims were correctly considered by the trial court and the plea of prescription or peremption was not available to appellant.
CLAIM OF WALLACE C. DRENNAN, INC.
Wallace C. Drennan, Inc., one of the sub-contractors who claims a lien by way of intervention, has answered the appeal and seeks an increase in the award granted in judgment.
Drennan had entered two sub-contracts for offsite development work in connection with drainage, sewerage and water supply, one being a unit price contract and the other being a cost-plus contract. The amount due under the unit price contract is not in dispute. Under the cost-plus contract, the commissioner rejected a claim for certain items entitled “Equipment rental” which Drennan had charged as one of the costs of performing the work. Although called equipment rental, the amount does not represent actual rental from some third party but is an amount charged by Drennan for the hours that its heavy equipment was used on the project, and which it contends is an item of cost under the contract. The contract itself contains an itemization of actual contractor costs to be assessed, to which is added 10% for overhead and 15% for profit. The contract also contains an equipment rental clause, which provides for reimbursement of all actual costs of rental, in which case no surcharges of 10 and 15% were to be added. The relevant portions of the contract are:

“CONTRACT PRICE:

“A. All of the work to be performed by Contractor under this Contract shall be performed on a ‘Cost-Plus’ basis, which is defined for purposes of this contract to mean the total of all costs in-
*595 curred by Contractor in effecting the work, to which cost factor shall be added a figure of ten per cent (10%) of said cost figure as contractor’s overhead; and to which figure of cost plus overhead shall be added a figure of fifteen per cent (15%) of the cost plus overhead as contractor’s profit.
“B. For purposes of this contract, Contractor’s costs shall include, but shall not be limited to, the following items:
a. all materials used on or for the job;
b. all wages and labor costs, including a figure equal to twenty per cent (20%) of all such wages to cover employees’ taxes, pension and retirement allowances, F.I.C.A. withholding, social security insurance and other costs;
c. mobilization and demobilization costs of all equipment;
d. costs of sand, fill and dirt as used on the job;
e. all other costs and expenses actually incurred by contractor in the prosecution of the work under this contract.
“C. The expenses of equipment rental for equipment used in the execution of this job, including but not limited to pumps, backhoes, bulldozers, earth moving machines and other equipment, shall be considered as a cost of the job to be paid by owner to contractor. However, owner shall not be required to pay to contractor ten per cent (10%) overhead and fifteen per cent (15%) profit on the costs of equipment rental.”
The commissioner’s findings were as follows:
“However, Drennan, before reaching the point of manned-unmanned work performed, must clearly show entitlement to such charges under the contract. Clearly, Drennan obligated himself to furnish all tools and transportation necessary to perform the work. The contract price identifies costs in paragraph B subsection a-e, Subsection C covers the expenses of rental equipment. The scheme of the contract price invisions an addition of 10% of costs as a designated contractors overhead. To this combined figure, an additional 15% has been added as a contractor’s profit.
“The Court is unable to perceive any method by which Drennan, having agreed to a 10% surcharge for overhead, can now call upon the owner contractor for an amount designated as rental of equipment, which is in effect an attempt to recover depreciation to its own equipment.
“There can be no question that Dren-nan could have actually rented from third parties such equipment. However, in this event, under paragraph C, Drennan would receive no 10% overhead nor 15% profit.
“The Court is therefore of the opinion that no invoices designated as rental of equipment are valid, and the amount of the lien filed by Wallace C. Drennan, Inc. should be reduced in such amounts.”
It is admitted by Drennan that these amounts are not rental, but he contends that they are valid costs under the terms of the contract. An examination of the contract does not disclose a precise enumeration of this item for an allowable cost, nor is there any evidence in the record that this is a standard item of costs envisioned in any cost-plus contract of this nature. We note however that the itemization of costs is not exclusive or limited only to the items specially mentioned, but paragraph (B) of the contract, in sub-section (c) mentions mobilization and demobilization costs of equipment and in subsection (e) permits all other costs and expenses actually incurred.
The only evidence on this issue is the testimony of Wallace C. Drennan, Jr., general superintendent of the claimant, and a number of documents introduced in connection therewith. The net effect of his testimony, together with a consideration of the invoices offered, forces us to conclude that the parties did originally consider that such an item was an allowable cost under the contract terms. We especially refer to the fact that a number of the invoices were accompanied by supporting documents which indicated approval of the use of hourly rates to be charged for equipment usage, *596 and the subsequent payment of these invoices in whole or in part, with an amount held out for retainage under the contract agreement, supports this conclusion. The contract here involved was mainly concerned with earth moving machines and other heavy equipment, and we cannot envisage such a situation wherein rational parties would enter a contract for use of such equipment without some remuneration. Clearly, paragraph (C) contemplated expenses of rental for this type of equipment, and it makes little sense to believe that a contractor would furnish his own equipment free, when he would be reimbursed if he rented it. The commissioner’s interpretation of the contract would provide that the addition of 10% of costs as overhead would be the measure of use of the equipment, together with the additional 15% profit. But that does not take into consideration the basis upon which those percentages can be applied. Presumably that interpretation would have the percentages applied only to the labor costs of the operator, if no material was being used for example in the digging of a ditch, or to both the labor and material that was used if some pipe were laid or other construction accomplished. We cannot agree with such an interpretation, and we believe the charge to be included as an item of costs under the contract, and thus would grant Drennan’s claim for the items deducted in the amount of $11,333.33, amending the judgment to make the total award in favor of Drennan $23,953.26.
CLAIM OF SUMMIT BUILDING, INC.
The claim of Summit Building, Inc. arises from a subcontract with G. & C. Properties, the contractor of the development project. Under the terms of the agreement Summit was to supply prefabricated building components for the project in a total amount of $891,398.34. Work had already started by the time the contract was finally agreed upon and as a result G. & C. Properties had already signed a purchase order from Sanford Truss Company for furnishing roof trusses and jacks. Accordingly, Summit Building agreed to give credit to G. & C. Properties for amounts expended on existing purchase orders. Thus, for every roof truss and jack furnished by Sanford Truss Company, Summit Building was to deduct that amount from the amount due Summit under the contract.
A lien in the amount of $112,719.49 was filed by Summit Building, but the Commissioner recognized its lien privilege only of $65,879.61. First the Commissioner disallowed the claim to the extent of representing the amount of materials Summit Building delivered to the job site, but took back. Because the project had closed down by the time that Summit attempted delivery, the materials remained on the trailer truck for several days, not receipted for by G. & C., and thereafter were returned to the fabrication yard at Summit Building. The Commissioner found that in view of the fact that Summit Building had removed the material to their own fabrication yard and that no one had accepted delivery of the items on the jobsite, nor were they ever unloaded there, that such a claim did not constitute a “furnishing material” as contemplated in R.S. 9:4801, et seq. We agree with the Commissioner’s determination. While ordinarily a furnisher of materials does not have the burden of proving actual use, under these facts there is no effective delivery and a positive showing of return of materials. While there may be a contractual obligation incurred by G. & C. because of contract terms, the obligation itself does not give rise to a privilege against the property under R.S. 9:4801. We agree that the lien and privilege should be disallowed in the amount of $20,972.24.
The Commissioner additionally disallowed the amount of $1,259.97, representing sales tax on that same claim. Summit contends this was error in that the Commissioner was making a double deduction for the sales tax. In argument before us counsel for appellee concedes there was a double deduction and we agree. We note that at page 107 of Summit exhibit # 2 there is recorded the claim of $20,972.24, of which sum $1,088.24 represented sales tax. Thus, when the Commissioner disallowed the *597 claim for $20,972.24 he also was disallowing the amount claimed for sales tax. However, the Commissioner, after disallowing the sum of $20,972.24, computed a sales tax at 6%, $1,259.97, and additionally subtracted that from the total claim. In view of the fact that the sales tax was already deducted in the original amount disallowed, that is $20,972.24, it was error to further deduct sales tax at 6%. Accordingly, we must amend the judgment of the trial court to increase the award to Summit Building by the amount of $1,259.79.
The third item that Summit seeks to be recognized is $24,607.67, the difference between the amount of credit claimed by G. & C. Properties and the amount of credit allowed by Summit. As previously mentioned, Summit Building was to allow G. & C. Properties credit for roof trusses and jacks purchased by G. & C. from Sanford Truss Company under a preexisting purchase order. The Commissioner found the problem to be one of accounting procedures and we agree. Mrs. Grein of Summit was the person responsible for keeping track of the number of trusses supplied by Sanford which were to be credited to G. & C. Summit Building relied on blueprint plans to figure the number of trusses supplied by Sanford Truss Company. G. & C. arrived at its figure by the use of invoices and dray receipts of Sanford and thus were able to keep a more accurate account of the actual number of trusses and roof jacks used.[2] The Commissioner found the procedure of G. & C. to be more preferable in arriving at the amount furnished and thus allowed the entire sum of $24,607.67 as a credit against the amount due Summit. We find no error in this determination.
Accordingly, we would affirm the judgment of the trial court in favor of Summit with the exception of $1,259.79 disallowed.
For the foregoing reasons we amend the judgment of the trial court as follows:
We increase the judgment in favor of Wallace C. Drennan, Inc., by the sum of $11,333.33, making the total award in favor of Wallace C. Drennan, Inc., the sum of $23,953.26.
We increase the judgment in favor of Summit Building, Inc. by the sum of $1,259.79, making the total award in favor of Summit Building, Inc., the sum of $67,-139.40.
As thus amended, we affirm the judgment in all particulars.

AMENDED AND AFFIRMED.

. Testimony of several persons was that Rouse’s Dozer Service had begun the clearing and construction project in early March, 1971 and had nearly completed work by the date of April 8, 1971. Besides clearing the land and cutting swale ditches, numerous basic roads which later became the paved streets of the subdivision were built in that time period.

. Roof jacks are wedge shaped boards used to adjust the elevation of the trusses. The Commissioner found them to be a necessary part of the components to be furnished and includable.